AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>DEVICE-1, CURRENTLY LOCATED AT THE<br>CINCINNTI FBI OFFICE, 2012 Ronald Reagan Drive,<br>Cincinnati, OH 45236 | )<br>)<br>)<br>)<br>)<br>)    Case No.   3:22-mj-00308 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(l), 841(b)<br>(l)(B)(viii), and 841(b)(1)(C) | Possession with intent to distribute 5 grams or more of methamphetamine, its<br>salts, isomers, and salts of its isomers, and possession with intent to distribute a<br>mixture or substance containing a detectable amount of fentanyl |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Fralick D. Joll*
*Applicant's signature*

Frederick D. Zollers, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone _____ *(specify reliable electronic means)*.

Date:   9/14/22

City and state:   Dayton, Ohio

Peter B. Silvain, Jr.
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
DEVICE-1, CURRENTLY LOCATED AT
THE **CINCINNTI FBI OFFICE**, 2012
Ronald Reagan Drive, Cincinnati, OH 45236

Case No. _3:22-mj-00308_

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Frederick D. Zollers**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—the listed electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a sworn law enforcement officer in the State of Ohio for fifteen (15) years. I am presently a sworn member of the Montgomery County Sheriff's Office. I am currently assigned to the Federal Bureau of Investigation's (FBI) Southern Ohio Safe Streets Task Force (SOSSTF) as a Task Force Officer (TFO). I have received training in drug trafficking investigations and have participated in numerous narcotics-related investigations (ultimately leading to successful prosecution) that involved surveillance, gathering evidence of money laundering, interviewing suspected drug traffickers, and supervising the activities of informants who provided information and assistance which resulted in the seizure of narcotics, firearms, and U.S. currency. I have conducted numerous investigations into the unlawful distribution and

possession of controlled substances, and the use and possession of firearms. Based on my training and experience, I am familiar with federal drug laws, and I am aware that it is a violation of Title 21, United States Code, Sections 841(a)(1) and 846 to knowingly and intentionally distribute and possess with intent to distribute controlled substances (including fentanyl and methamphetamine), and conspiracy to commit the same. I am also aware through my training and experience that drug traffickers commonly use cellular telephones and electronic devices to facilitate their drug trafficking activities/crimes.

3.      Along with other agents, task force officers, and law enforcement officials, I am currently involved in the investigation of drug trafficking committed by Demarcus CUNIGAN including violations of the following Subject Offenses: 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii), and 841(b)(1)(C) (knowingly and intentionally possess with intent to distribute 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance and knowingly and intentionally possess with intent to distribute a mixture or substance containing a detectable amount of fentanyl, also known as N-phenyl-N-[ 1-(2-phenylethyl) -4-piperidinyl ] propanamide, a Schedule II controlled substance. ).

4.      I have personally participated in this investigation and have spoken to, as well as received information from, other agents and investigators participating in this matter. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is one electronic device, hereinafter listed as

**DEVICE-1.** The Device is currently located at the Cincinnati FBI Office, 2012 Ronald Reagan

Drive, Cincinnati Ohio and further described as follows:

      a.  **DEVICE-1:** Red Apple iPhone with assigned cellular phone number 937-286-

      2115

**Device-1** is described in Attachment A, which is incorporated by reference.

6.      I believe that there is probable cause to believe that evidence of the Subject

Offenses will be found on the Subject Device. The applied-for warrant would authorize the

forensic examination of the Subject Device for the purpose of identifying electronically stored

data particularly described in Attachment B.

## PROBABLE CAUSE

7.      Beginning in March of 2022 and continuing thereafter, Detective Sean Humphrey

and members of the Regional Agencies Narcotics and Gun Enforcement (RANGE) Task Force

began investigating CUNIGAN for distributing fentanyl and methamphetamine after receiving

information that CUNIGAN was trafficking illegal narcotics in the Dayton, Ohio area.

8.      On March 23, 2022, I, members of the RANGE Task Force and members of the

FBI Safe Streets Task Force conducted an operation utilizing a Confidential Informant (CI) and

Undercover Officer (UC) to arrange to purchase a quantity of methamphetamine from

CUNIGAN. Prior to arranging the drug transaction, task force members conducted surveillance

at 1708 West Riverview Avenue in the City of Dayton. Task force members observed a black

3

Dodge Charger known to be driven by CUNIGAN parked behind the apartment building.

9.       After locating the Dodge Charger parked at 1708 West Riverview Avenue, the CI and UC called cellular phone number 937-286-2115 to arrange the narcotics transaction. Detective Humphrey had previously identified cellular phone number 937-286-2115 to be a cellular phone number believed to be used by CUNIGAN according to information obtained from a law enforcement database.

10.      The CI spoke with a male and arranged to purchase a quantity of methamphetamine.  The male directed the CI and UC to drive to the More For Less, located at 444 James H. McGee Boulevard.  After the meet location was determined, task force members observed CUNIGAN exit 1708 West Riverview Avenue and depart driving the Dodge Charger. Task force members observed a known female (hereinafter identified as TH) exit the apartment building with CUNIGAN and depart in a silver Ford SUV.  Task force members surveilled CUNIGAN as he drove toward the More For Less, followed by TH.  CUNIGAN was the sole occupant driver of the Dodge Charger and he was known by investigators to have an invalid driver's license.

11.      Detective Humphrey coordinated with Dayton Police Department (DPD) Officer Vincent Carter to conduct a traffic stop on CUNIGAN prior to him getting to the More For Less. In the area of Rosedale Avenue and James H. McGee Boulevard, Officer Carter pulled behind the Dodge Charger and initiated a traffic stop on CUNIGAN.  CUNIGAN turned right onto James H. McGee Boulevard and continued to travel at a slow speed failing to immediately stop for Officer Carter.  I was parked in my unmarked vehicle in the entrance/exit to the More For Less at James H. McGee Boulevard, northwest of CUNIGAN.  I observed that CUNIGAN failed to immediately stop for Officer Carter.  I began to pull out onto James H. McGee Boulevard to

4

get in front of CUNIGAN. As I pulled out onto James H. McGee Boulevard, CUNIGAN merged from the left to right lane of James H. McGee Boulevard in front of the More For Less. As CUNIGAN merged into the right lane, I observed a blue in color item thrown out of the passenger side of the Dodge Charger before CUNIGAN attempted to merge back into the left lane and drive around my unmarked vehicle. Additional marked cruisers and unmarked cars were able to get CUNIGAN stopped near the entrance/exit to the More For Less. After CUNIGAN was stopped and detained, I advised task force officers that CUNIGAN threw a blue in color item out the passenger side of the Dodge Charger prior to stopping. Task force members immediately located a blue rubber glove containing a plastic baggie of a crystal-like substance suspected to be methamphetamine in the roadway. The blue glove containing the suspected methamphetamine is pictured below:



12.    Task force members searched the inside of the Dodge Charger incident to CUNIGAN's arrest and located an Apple iPhone (hereinafter **DEVICE-1**). Detective Humphrey called the cellular phone number (937-286-2115) that the CI called to arrange the narcotics purchase and **DEVICE-1** rang.

5

13.     While CUNIGAN was being detained, task force members continued to surveil TH as she drove past the traffic stop location. TH drove back toward the apartment building on Riverview Avenue. Task force members stopped TH and spoke with her regarding the investigation involving CUNIGAN and events leading up to his arrest. Detective Humphrey spoke with TH and she identified 1708 West Riverview Avenue, Apartment C as her apartment. TH advised that CUNIGAN does not reside at her apartment, however he does keep items in a room in her apartment and he frequents her apartment several times a day. Prior to speaking with TH, Detective Humphrey spoke with CUNIGAN post-*Miranda* and CUNIGAN told Detective Humphrey that he did not live at 1708 West Riverview Avenue, Apartment C. CUNIGAN denied tossing the blue rubber glove containing suspected methamphetamine out of the Dodge Charger.

14.     Detective Humphrey obtained written consent from TH allowing task force members to search 1708 West Riverview Avenue, Apartment C. While searching the apartment, TH directed task force members to an extra room where they located a digital scale with powder residue, the bottom portion of a bullet blender, and a shoebox that contained the following but not limited to items:

      a.   the top portion of a bullet blender;

      b.   two bottles of powder that is often used as a cutting agent for narcotics;

      c.   a baggie containing approximately 5.87 grams of a white powder suspected to be fentanyl;

      d.   a bag containing a small quantity of blue powder suspected to be fentanyl;

      e.   a box of sandwich baggies that contained another baggie of approximately 4.2 grams of suspected fentanyl; and

f.  CUNIGAN's United States Pretrial Services Supervision Identification Card.

15.    Based on training and experience, I know that cards like CUNIGAN's United States Pretrial Services Supervision Identification Card are often used to cut up and divide powders used in narcotics for packaging and distribution.  Through my training and experience I believe the above items contained fentanyl.  Due to the dangers or fentanyl, these items were not tested.  I know that approximately 9 grams of fentanyl, coupled with the drug processing equipment, is indicative of possessing fentanyl with the intention of distributing it.  The above-described shoebox and items found in the shoebox are pictured below:





16.    Following CUNIGAN's arrest, Detective Humphrey listened to several recorded calls that CUNIGAN made while incarcerated at the Montgomery County Jail.   Detective Humphrey listened to recorded calls that CUNIGAN made to a female believed to be TH at phone number 937-409-5254.   In summary, on the first call a female believed to be TH, informed CUNIGAN that the police found his prison card (United States Pretrial Supervision Identification Card) in the box with the stuff.   CUNIGAN responded that he uses that shit, referring to the drugs in the box.   On the fourth call that CUNIGAN made, he talked about the police having access to his phone number and trying to set him up.   CUNIGAN indicated that he did not complete it, so worst case is a possession if the police can prove he threw the drugs out.

17.    Detective Humphrey field tested the baggie of suspected methamphetamine and the test indicated positive for methamphetamine.   The baggie of methamphetamine had an approximate field weight of 46 grams.   Based on training and experience, I know that 46 grams of methamphetamine is distribution quantity.

18.     Based on a review of CUNIGAN's criminal history, I know he has prior state drug trafficking conviction for the following:

    a.  Trafficking in Heroin, a felony of the third degree, in violation of Ohio Revised Code § 2925.03(A)(2). This conviction occurred in Montgomery County Common Pleas Court Case No. 2015 CR 00673.

19.     Additionally, I know that CUNIGAN is currently on pre-trial release through the Southern District Court of Ohio for violation of felon in possession of a firearm in case number 3:21-CR-00080.

20.     Laboratory analysis has been completed and the suspected controlled substances contained the following: 45.1 grams of Methamphetamine Hydrochloride, 1.679 grams of Fentanyl, 4.81 grams of Fentanyl, 0.32 grams of Fentanyl, and 3.21 grams of Cocaine.

21.     On April 26, 2022, CUNIGAN was charged by way of Grand Jury Indictment for violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii), and 841(b)(1)(C), knowingly and intentionally possess with intent to distribute 5 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance and knowingly and intentionally possess with intent to distribute a mixture or substance containing a detectable amount of fentanyl, also known as N-phenyl-N-[ 1-(2-phenylethyl) -4-piperidinyl ] propanamide, a Schedule II controlled substance. *See United States v. Demarcus Cunigan,* 3:22-cr-39, Indictment, ECF No. 16 at PageID 41-43.

22.     I believe concealed within **DEVICE-1** are the numbers associated with that cellular phone, names, text messages, voice mail messages, photographs/videos, contact numbers, addresses, related stored information, call logs, and any deleted information for individuals involved in the purchase, transportation, and/or distribution of illegal narcotics.

9

Specifically, I believe **DEVICE-1** will contain names and phone numbers of co-conspirators (both drug suppliers and drug customers) in the contact list, calls to other co-conspirators in the call log and text messages to those same co-conspirators that can be used as evidence of possession with the intent to distribute and to distribute controlled substances and conspiracy to do the same (21 U.S.C. § 841(a)(1) and 846) and use of a communication device to facilitate a crime (21 U.S.C. § 843(b)).

23.    I believe **DEVICE-1** will contain the information listed above based upon law enforcement's observations of CUNIGAN on March 23, 2022, and the significant amount of drug trafficking evidence seized at the apartment and outside the vehicle that CUNIGAN operated. Further, based upon my prior training and experience in narcotics investigations, it is my considered opinion that individuals who engage in drug trafficking commonly utilize cellular telephones to generate and receive voice messages, text messages, WhatsApp messages by and between associates, colleagues, and co-conspirators and also to track and sell drug shipments. Those engaging in drug trafficking commonly use multiple cellular telephones to notify/alert co-conspirators of the arrival of a shipment, to arrange for its pick-up and to deposit money. It is often common for drug traffickers to have multiple phones because certain phones may be used only for certain purposes. For instance, a trafficker may use one phone just to speak to his supplier, while using a different phone to speak only to his customers. This is a counter-surveillance technique intended to make it harder for law enforcement to identify the user of the phones and his associates. Traffickers commonly use prepaid cellular phones to hide their identity as the user because they generate no billing information, often require little or no identifying information to activate, can sometimes be activated using an alias, and can be easily disposed of should the trafficker believe that law enforcement has identified the phone number.

24.     I also know traffickers, using digital cameras located on their cellular phone or other electronic devices, will sometimes use these devices to take photographs or videos of themselves, their location, their product, their firearms or their associates, which can be electronically stored on, and transmitted from, these electronic devices. Information can also be downloaded from the Internet onto the cellular phone or smart devices, such as email, social network information (like "Facebook"), travel information like maps or directions, or photographs.

25.     I also know that drug traffickers often threaten violence or use force against their rivals as well as customers who, for instance, may owe them money. In doing so, drug traffickers often use electronic devices such as cellular telephones, smartphones, tablets, and the like, to send communications referencing violence, use or possession of firearms, or threats.

26.     In this modern era, individuals also use smart telephones and smart devices to logon to online banking platforms. I know that drug traffickers often use banking services to transmit money to their domestic and international suppliers.

27.     Based on my knowledge, training, and experience, I know electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28.     The Subject Device is currently in the lawful possession of the FBI at 2012 Ronald Reagan Drive, Cincinnati, OH 45236. In my training and experience, I know the Subject Device has been stored in a manner in which their contents are, to the extent material to this

investigation, in substantially the same state as they were when they first came into the possession of the FBI.

## TECHNICAL TERMS

29.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

12

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved

13

in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

14

in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

14

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know the Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

16

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

30. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know the Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

32. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

16

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

d. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17

33. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

34. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

35. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Frederick D. Zollers
Task Force Officer
Federal Bureau of Investigations

Subscribed and sworn to before me
on September 14 2022:

Peter B. Silvain, Jr.
United States Magistrate Judge

## ATTACHMENT A

The property to be searched includes:

    a. **DEVICE-1:** Red Apple iPhone with assigned cellular phone number 937-286-

    2115. Pictured below:



The Subject Device is currently located at the FBI Office at 2012 Ronald Reagan Drive,

Cincinnati, OH 45236.

    This warrant authorizes the forensic examination of the Subject Devices for the purpose

of identifying the electronically stored information described in Attachment B.